In the Matter of the Application of the SCHOOL BOARD OF THE BOROUGH OF BROOKLYN, Respondent, *v.* THE BOARD OF EDUCATION OF THE CITY OF NEW YORK et al., Appellants.

1. NEW YORK CITY — APPORTIONMENT OF GENERAL SCHOOL FUND AMONG BOROUGHS. By force of section 11 of the Greater New York charter (L. 1897, ch. 378), the general school fund of the city must be apportioned by the city board of education among the several borough school boards, upon the basis prescribed by section 1065, from July 1, 1898.

2. APPORTIONMENT TO BOROUGH OF BROOKLYN. The fact that the apportionment of the general school fund for 1898 upon the basis prescribed by section 1065 of the charter gives the borough of Brooklyn a larger proportionate share of the fund than was raised there for school purposes is saved from conflict with the provision of section 10, that the funds of the various departments shall be used as nearly as may be for the object for which they were raised, by the scheme for the equalization of taxation among the boroughs, provided by section 901.

*Matter of School Board of Brooklyn,* 34 App. Div. 49, affirmed.

(Argued November 22, 1898; decided January 10, 1899.)

APPEAL from an order of the Appellate Division of the Supreme Court in the second judicial department, entered November 5, 1898, affirming an order of the Special Term granting a peremptory writ of mandamus.

The facts, so far as material, are stated in the opinion.

*E. Ellery Anderson* for appellants. The method of apportionment prescribed in section 1065 has no application whatever to so much of the general school fund allowed for 1898 as remained unexpended on the 1st day of July, 1898. (L. 1897, ch. 378, §§ 10, 11.) The board of estimate and apportionment have complete and exclusive jurisdiction over the expenditures of all the moneys raised for the various parts of the city of New York for the year 1898. (L. 1897, ch. 378, §§ 10, 11.) The method of distribution provided by section 1065 of the charter was intended to be first applied to the general fund raised for the year 1899. (L. 1897, ch. 378, §§ 10, 11, 1099.) Section 901 of the charter cannot afford

any relief to the inequalities and injustice which must result in the boroughs of Manhattan and the Bronx, Queens and Richmond, if the order appealed from should be carried into effect. (*People ex rel.* v. *Comrs. of Taxes*, 95 N. Y. 554.)

*Ira Leo Bamberger* and *J. Edward Swanstrom* for respondent. The apportionment must be made under and in pursuance of section 1065 of the charter. (L. 1897, ch. 378, § 11.) The grounds assigned by the appellants for the inapplicability of section 1065 of the charter to the general school fund for the year 1898 are untenable. (L. 1897, ch. 378, § 11.)

O'BRIEN, J. The court below has sustained an order made on the relator's application, directing that a peremptory writ of mandamus issue requiring the board of education of the city of New York to forthwith apportion the general school fund, amounting to $4,638,812.76, among the several borough school boards of the city in the manner provided and required by section 1065 of the charter. The school boards of the other three boroughs of the city were made parties to the proceeding, and they filed answers to the petition of the relator. The answer in each case was, in substance, that certain action taken by the board of estimate and apportionment in regard to the distribution of this school fund, which is set forth in the petition, was final and conclusive, and that no further duty or right to apportion the fund is vested in the defendant, the board of education.

The controversy involves the construction of at least four different sections of the new charter. Counsel on both sides of this controversy have been able to find in the various and somewhat complicated provisions of the statute language and expressions which would seem to support their respective contentions. This, perhaps, is not surprising, considering the purpose of the enactment and the circumstances under which it became a law. The commissioners who framed the act and the legislature that enacted it were confronted with a problem in constructive legislation of great difficulty. The act provided for a comprehensive scheme of municipal government

for a new city, which was to embrace four different municipal organizations that at the time were under as many different forms of municipal government in full operation, and the problem was to mould them into one, and at the same time to retain the old institutions and regulations until the new scheme was put into full operation. The difficulty of carrying out so complicated a scheme must necessarily leave much for the courts to pass upon. It is their duty to give construction to the various provisions of the charter according to the spirit and purpose which induced their enactment, and where the provisions are apparently in conflict, we must seek out the general purpose of the law, and give such construction to each section and provision as will conform to the intention of the legislature and best promote the harmonious operation of the whole. (*Blaschko* v. *Wurster*, 156 N. Y. 442.)

The new charter, chapter 378 of the Laws of 1897, became a law by the approval of the governor on the 4th day of May, 1897. A few of its provisions were to take effect at that date, but generally the main provisions and the whole act were to become operative at a future day, and the first day of January, 1898, was fixed as the time when the whole scheme was to go into full operation. It provided for a general department of education, which was to possess certain powers over the subject of education throughout the whole city. The head of this department was to be known as the board of education, and that body is the defendant in this proceeding. It also provided for school boards in the several boroughs embraced within the city, which were to have charge of the schools in such boroughs under the general direction of the board of education, which was to represent the schools and the school system of the city. The powers and duties of the board of education were general. Those of the several school boards were local.

It was provided by the tenth section of the act that, although the charter was passed in May, 1897, yet that during that year the proper authorities of the various municipal and public corporations consolidated by the act should prepare a

budget for the year 1898, as required by their then existing laws, and to levy taxes for that year according to existing laws as though no consolidation had taken place, and that the taxes thus levied in the year 1897 for the expenses of government in the year 1898 might be used for the expenses of the new city in such manner as the board of estimate and apportionment for that year might determine, and that it should be the duty of that board to apportion the said funds of the various departments created by the new charter *so that such funds should be used as nearly as may be for the objects for which they were raised.* It is contended in behalf of the defendants that this provision of the charter has been ignored in the decision below. It is admitted that the borough of Brooklyn or its school board is to receive under the order appealed from the sum of $325,000 more than it raised for school purposes in the year 1897, and this large sum in excess of its contribution to the fund is at the expense of the other three boroughs, which must, under such distribution, receive less than they contribute for the support of schools, and hence it is urged that the money contributed by the other three boroughs for school purposes will not, under the operation of the order appealed from, be used as nearly as may be for the objects for which it was raised.

If this position is not modified or answered by other provisions of the charter, which will be referred to hereafter, it ought to have great force and weight in determining this controversy in favor of the defendants, since no statute of this character should receive a construction that would accomplish such manifest injustice if any other construction were reasonably possible. Reading section ten by itself, it would be clearly unjust to apportion to the borough of Brooklyn from the funds in the treasury for school purposes in the year 1898 such a large sum in excess of what it had levied and collected for school purposes in the previous year. But we think that this apparent injustice is corrected by other sections of the charter, and that in the end this excess must be restored to the localities from which it was raised so that while there may be

72

some temporary inconvenience by reason of the construction which the courts below have given to the charter, yet no permanent injustice can be done, and that the apprehensions of the learned counsel for the defendants in that respect are not well founded. This will be seen quite clearly from the other provisions of the charter which must now be noticed.

It is provided by the next section, section 11, that the board of estimate and apportionment shall, out of the residue of the various funds raised for the support of the public schools of the different parts of the city during the year 1898, constitute from and after July first, 1898, the special school fund and the general school fund for that year, so that the schools of the city may begin in the autumn of the year 1898 to be conducted upon the basis of this division of funds, and, in general, upon the system prescribed in the new charter; that up to July 1st, 1898, the school moneys shall be spent as raised, for all school purposes, by the various school boards respectively. The section ends with the express provision that the new system for the public schools of the city, as provided by the charter, shall go into full effect on the first of July, 1898. It is admitted by the learned counsel for the defendants that the distribution of the school funds upon the basis provided for by the order now under review would be correct on or after the first of January, 1899, but that, inasmuch as the other section above referred to provides that the school funds raised shall be used, as nearly as may be, for the objects for which they were raised, that the general system for the support of schools provided for by the charter could not go into complete effect until the first of January, 1899. But the 11th section is very clear and explicit. It is impossible to mistake the purpose of the lawmakers, that the distribution of moneys for the new system of education was to be made on and after, and all the provisions of the charter relating to education were to be in complete operation on the first of July, 1898, to the end that the schools might begin in the following autumn, and be conducted upon the system prescribed in the new charter.

That system is very clearly outlined in section 1065, which provides that the general school fund shall be apportioned among the several school boards by the board of education in proportion to the aggregate number of days of attendance of the pupils resident in the boroughs under their charge, between the ages of five and fifteen years, at their respective schools, during the last preceding school year, and also of such pupils resident therein over four years of age as shall, during the last preceding school year, have attended any kindergarten school established under the direction of the school boards pursuant to the provisions of the act. It also provided that the aggregate number of days of attendance of the pupils was to be ascertained from the records kept by the teachers as therein prescribed, that is, by adding together the whole number of days of attendance of each pupil in the schools under the charge of the respective school boards. Here, therefore, was a provision for the distribution of the school fund upon the basis of attendance; but there was further provision to the effect that each school board should receive from the fund a distributive quota of $100 for every qualified teacher, or for the successive qualified teachers, who should have actually taught in the schools under the charge of the board during the term of not less than thirty-two weeks of five successive days each, inclusive of legal holidays. Through the operation of this basis of distribution Brooklyn receives, under the new system, a much larger proportionate share of the general school fund than was raised there under the act. It is said that, on the first of July, 1898, there could not have been thirty-two school weeks under the new system, since that did not take effect until January first, 1898, and the last preceding school year referred to in the section must mean a full school year under the new system, and since that time had not elapsed the section could not be applied to a distribution of the school fund prior to January first, 1899. But we think that the period of thirty-two weeks, and the last preceding school year referred to in the section as the basis of distribution, does not necessarily mean a school year, or a term under the new system, and that it

was the evident intention of the lawmakers in providing for giving effect to the new system on the first of July to permit the computation of those periods from the first of July, 1897. The framers of the charter contemplated that old regulations were to be used to put the new ones in full operation, and one of the main questions in this case is when the old ceased and the new began.

The injustice in apportioning to Brooklyn such a large sum in excess of what was raised in that locality for school purposes is, we think, answered by the provisions of section 901, which provide that inasmuch as the amounts due in the way of taxes for state and municipal purposes for the year 1898 will have to be levied in the boroughs of Brooklyn, Queens and Richmond prior to the first day of January, 1898, but not in the city of New York, that in order to prevent double taxation outside of the limits of the then existing city of New York for the year 1898, it was provided that in that year the balance so caused to be raised by tax should be raised exclusively from property within the limits of the old city. It was further provided that in case the amount levied or collected from any borough outside of the city as it then existed, and which was available to the uses of the new city for the year 1898, should be more or less than its due proportion of the expenses of the new city for that year, then such excess or deficit should be equalized and adjusted in the budget of the following year, to the end that each borough should bear its fair proportion of the expenses of the city for the year 1898, and that the municipal assembly should have full power, by appropriate ordinances to enforce that provision, and it was vested with power to make such adjustment by different rates of taxation or otherwise in the several boroughs, to the end that, taking the years 1898 and 1899 together, each borough should pay its equitable and proper proportion of the general expenses of the city for both years. This provision, we think, confers authority upon the municipal assembly, or other proper authorities, of the new city to charge in the budget of the next year, that is, the year 1899, to the borough of Brooklyn the

amount now claimed by it and which has been awarded to it by the order in question, that is in excess of the sum which it raised by taxation for school purposes in the previous year under section ten, and to credit this sum to the boroughs from which it was taken by the apportionment of the school fund sanctioned in the courts below.

This construction is entirely warranted by the language of the section, and it rectifies any apparent injustice in the distribution of the school fund authorized by the order now under review.    It is said, however, that in the meantime the appropriation for salaries of teachers and other expenses of the schools is impaired by a diversion of more money to Brooklyn than has been raised there.    That is probably true, but it is, as before observed nothing more than a temporary inconvenience which can be relieved in a very short time.    It was perhaps impossible to abrogate or suspend the functions of the four municipalities, provide for their consolidation into one, and put into operation a new system of government applicable to the whole, without some embarrassment and inconvenience such as this construction must recognize.    Something of the kind was evidently contemplated in section ten, which provides for the apportionment of the taxes levied in the year 1897 in such a way that the funds should be used as nearly as may be for the objects for which they were raised.    If it were supposed that the school funds raised, or levied, in the several boroughs in that year were to go back to the source from which they came, there was no apparent necessity for using the phrase " as near as may be," since the relative proportion of the school fund could be computed, upon the defendants' construction of the statute, with substantial mathematical accuracy.    This direction for the use of the taxes levied in the three boroughs in the year 1897 should receive a reasonable construction, so that it may not conflict with the very plain provisions of section eleven, providing for putting the new system for the support of the schools into operation on the first of July, 1898.

The construction adopted permits the harmonious operation

of all the sections referred to without doing violence to language or conflicting with the general purpose of the act.

We are of the opinion, therefore, that the construction given to these several provisions of the charter by the learned courts below was correct, and that the order should be affirmed, with costs.

All concur.

Order affirmed.